UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
     For Online Publication Only

---------------------------------------------------------------------X

ABDELRAHMAN SEWEID,

              Plaintiff,        **MEMORANDUM & ORDER**
                                    21-cv-03712 (JMA) (AYS)

    -against-

                                 **FILED**
COUNTY OF NASSAU, NASSAU COUNTY       **CLERK**
SHERIFF'S DEPARTMENT, CORRECTIONAL
OFFICER BRYAN SCHMITT in his individual   12:48 pm, Feb 20, 2024
and official capacity, CORRECTIONAL OFFICER
ANTHONY DESTEFANO in his individual and   **U.S. DISTRICT COURT**
official capacity, CORRECTIONAL OFFICER   **EASTERN DISTRICT OF NEW YORK**
ROBERT CRUZ in his individual and official   **LONG ISLAND OFFICE**
capacity, CORPORAL ENRIQUE SEWER,
in his individual and official capacity,
CORRECTIONAL OFFICERS "JOHN DOES
ONE through TEN" in their individual and official
capacities as employees,

              Defendants.

---------------------------------------------------------------------X

**AZRACK, United States District Judge:**

     This civil rights action stems from an alleged search of Plaintiff Abdelrahman Seweid's

("Seweid") jail cell at the Nassau County Correctional Center ("NCCC") on October 17, 2018.

Seweid's Complaint alleges 14 causes of action under 42 U.S.C. § 1983, but various pretrial

conferences and stipulations have narrowed the claims to-be-tried to two. After Seweid's counsel

failed to timely arrange for his client's appearance at trial, Defendants County of Nassau ("Nassau

County"), Nassau County Sheriff's Department ("Sheriff's Department"), Correctional Officer

Bryan Schmitt ("Officer Schmitt"), Correctional Officer Anthony Destefano ("Officer

Destefano"), Correctional Officer Robert Cruz ("Officer Cruz"), and Corporal Enrique Sewer

("Corporal Sewer") (collectively, "Defendants") renewed a request to move for summary

judgment—this time on Seweid's remaining claims.  The Court granted Defendants' request, and Defendants filed this motion on November 17, 2023.

For the below reasons, Defendants' motion for summary judgment is DENIED.

## I.    BACKGROUND

### A.    <u>Factual Background</u>.[1]

This lawsuit stems from an alleged search of Seweid's jail cell at the NCCC on October 17, 2018.  The facts below are undisputed unless otherwise noted.

On October 17, 2018, Seweid was an inmate at the NCCC, in the care and custody of the Sheriff's Department.  (<u>See</u> Seweid 56.1 ¶¶ 2–3.)  At that time, Nassau County employed Bryan Schmitt, Robert Cruz, and Anthony Destefano as Corrections Officers and Enrique Sewer as a Corporal.[2]  (<u>See</u> Defs.' 56.1 ¶¶ 1–5.)  None of those men recall ever interacting with Seweid, including searching his cell on the day in question.  (<u>See</u> <u>id.</u> ¶ 29; <u>see also</u> <u>id.</u> at p. 1 n.1.)  Even accepting the truth of Seweid's allegations described below, as the Court must, Defendants argue that they "do not set forth any viable constitutional claim."  (<u>Id.</u>)  And even if they did, Defendants contend the Officers are entitled to qualified immunity from liability.  (<u>See</u> Defs.' Br. 15.)

On October 17, 2018, a nurse employed by the Sheriff's Department "requested that the Correction[al] Officers lock down the cells while he distributed medication to the detainees."

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment.  The Court draws primarily from Defendants' Local Civil Rule 56.1 Statement of Material Undisputed Facts (ECF No. 55-3 ("Defs.' 56.1")), Seweid's Response to Defendants' Local Civil Rule 56.1 Statement and Statement of Additional Material Facts pursuant to Local Civil Rule 56.1(b) (ECF. No. 55-30 ("Seweid 56.1")), Defendants' Response to Seweid's Statement of Additional Material Facts (ECF No. 55-45 ("Defs.' Reply 56.1")), and Seweid's Deposition Transcript (ECF No. 55-11 ("Seweid Dep. Tr.")).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  In addition, "[e]ach numbered paragraph in the statement of material facts . . . will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).  For ease of reference, the Court refers to Defendants' brief in support of its motion for summary judgment as "Defs.' Br." (ECF No. 55-1), to Seweid's opposition brief as "Seweid Opp." (ECF No. 55-28), and to Defendants' reply brief as "Defs.' Reply Br." (ECF No. 55-43.)

[2]    Robert Cruz is currently employed by Nassau County as a Corporal.  (<u>See</u> Defs.' 56.1 ¶ 3.)

(Seweid 56.1 ¶ 4.)  It is undisputed Seweid told the nurse—while receiving his medication—that locking down the cells was a "punk move."  (Seweid 56.1 ¶ 6.)  Seweid testified that—soon after making the comment—Officer Schmitt asked Seweid if he had "a problem" while conducting patrol around the cells.  (Seweid Dep. Tr. at 27.)  Seweid testified that he responded "no."  (Id.)  According to Seweid's testimony, Officer Schmitt then told him "now you got a fucking problem" before walking away.  (Id.)  Officer Schmitt denies making both comments to Seweid.  (See Defs.' Reply 56.1 ¶¶ 7–8.)

Soon after, Seweid testified Officers Schmitt, Cruz, and Destefano approached his jail cell without a supervisor present.  (See Seweid Dep. Tr. at 38–39.)  The Officers told him to "put his hands behind [his] head," to "turn around," and to "back out of his cell."  (Id. at 39.)  After complying, Seweid was "frisked," "handcuffed behind [his] back," and "placed on the wall right next to [his] cell."  (Id.)  At this point, Seweid "fac[ed] the wall right next to [his] cell."  (Id. at 40.)  Then, Officer Schmitt went inside Seweid's cell and "conducted a search" while Officers Destefano and Cruz stood outside the cell with him.  (Id. at 42–43.)  Seweid heard—but did not see—Officer Schmitt throwing things around inside his cell.  (See id. at 43.)

After being uncuffed by Officer Cruz, Seweid testified Officer Schmitt told him to clean up his cell.  (See Seweid Dep. Tr. at 44.)  Specifically, Officer Schmitt threw Seweid's "pictures in the toilet," left his "religious book on the floor wide open," and took his sheets off his mattress before telling him to "clean this shit up."  (Id. at 44–45.)  As he knelt to pick up his belongings, Seweid testified that Officer Schmitt urinated on his "bed," "sheets," "blankets," "books," "pictures," and most notably, on "the back of [his right] leg" near his calf.  (Id. at 48.)  During this time, Officers Destefano and Cruz stood "outside the cell looking in."  (Id. at 46.)  Immediately after the incident occurred, Seweid attested Officer Schmitt told him that he was "not such a tough guy anymore" before closing the cell door.  (See id. at 48.)

3

As mentioned, Defendants do not recall the cell search ever occurring. (See Defs.' 56.1 ¶ 29.) Accordingly, they deny: (i) Officer Schmitt urinating in Seweid's cell or on him (id. ¶ 30); and (ii) the allegations levied against Officers Destefano and Cruz for failing to intervene. (See Defs.' Reply ¶¶ 15–16.) The parties do not dispute—however—Corporal Sewer's testimony that no record existed for a search of Seweid's cell.[3] (See Seweid 56.1 ¶ 19.)

Seweid's Complaint alleges that Corporal Sewer did not conduct a nighttime check of the cells on October 17, 2018, effectively preventing him from reporting the incident that night. (See Defs.' 56.1 ¶ 31; see also Compl. ¶ 24, ECF No. 1.) But Seweid later testified differently, stating that Corporal Sewer did make rounds the night of October 17, 2018. (See Defs.' 56.1 ¶ 32.) And when Corporal Sewer came by Seweid's cell that evening, Seweid testified that he said nothing to Corporal Sewer. (See id. ¶ 33.)

As a result of the incident, Seweid does not claim to have sustained a rash on his leg; rather, Seweid's Complaint alleges that he sustained rash on his face. (See Compl. ¶ 94, ECF No. 1.) According to Seweid, he sustained a face rash after being exposed to Office Schmitt's urination— either from sleeping on his mattress the evening of October 17, 2018 or from using his towel on October 18, 2018. (See Seweid 56.1 ¶ 22; see also Seweid Dep. Tr. at 66–67.))

With respect to sleeping on his mattress, Seweid testified that—on the evening of October 17, 2018—he was "locked in [his] cell the whole night with urine all over [him] and all over the cell." (Seweid Dep. Tr. at 56.) But Seweid contrastingly testified that—right after the incident— he removed his pants, wet bedding, and towel, put them in a corner, and then wiped down other

---

[3]    Instead of disputing his testimony, Seweid points to Corporal Sewer's acknowledgment that there were times known to him where officers conducted searches without proper supervision. (See Seweid 56.1 ¶ 19 (citing Ex. E at 51–52, ECF No. 55-34).) But notably, Corporal Sewer testified that no unlogged or unsupervised cell searches occurred while he was supervisor. (See Defs.' Reply ¶ 19.) To circumvent this undisputed testimony, Seweid claims "Corporal Sewer made clear . . . that even if the violation of [Seweid] occurred, no one would admit to it." (See Seweid 56.1 ¶ 20.) Such a statement, however, is not supported by the testimony Seweid cites. (See Ex. D at 26–27, ECF No. 55-34.) In any event, Defendants all testified the incident did not occur, and the Officers allegedly involved testified they would have reported it if it had. (See Defs.' Reply ¶ 20.)

objects in his cell before sleeping on his mattress that evening.[4]  (See id. at 51.)  Defendants introduce uncontroverted evidence that the "mattresses at NCCC are plastic-coated and non-absorbent," meaning "[a]ny liquid could be wiped directly off [them]."[5]  (Defs.' 56.1 ¶¶ 35–36.)

With respect to the urinated-on towel, Seweid testified he used it the day after the incident.  (See Seweid Dep. Tr. at 67.)  Seweid attested he did not realize Officer Schmitt urinated on the towel until after he used it on October 18, 2018.  (See id.)  This contradicts Seweid's prior testimony stating that—the day before, right after the incident—he removed the wet bedding and towel, put them in a corner, and wiped down other objects in his cell.  (See id. at 51.)

Also on October 18, 2018, Seweid testified he filed a formal grievance with the New York State Commission of Correction but did not receive a response.[6]  (See Seweid Dep. Tr. at 75–77.)  The same day, Seweid testified he filed a written sick call request.  (See id. at 78.)  In it, Seweid testified he complained about a facial rash borne from Officer Schmitt urinating on him and "all over [his] property."  (Id. at 79.)  Further, Seweid claims to have "made a request for medical treatment for that injury."  (See Seweid 56.1 ¶ 22.)  Notably, Seweid does not provide the Court with a copy of the written sick call form.

---

[4]     As explained below, this testimony cuts against Seweid's later attestation that he did not know Officer Schmitt urinated on his towel until he used it the next day, on October 18, 2018.  (See Seweid Dep. Tr. at 66–67.)

[5]     Seweid lacks information to form a belief about the truth of Defendants' statement.  (See Seweid 56.1 at p. 9.)  Defendants argue that "it seems particularly unlikely that [Seweid] would have sustained a rash on his face from sleeping on a non-absorbent plastic mattress—one that was covered with a blanket and a sheet when Officer Schmitt supposedly urinated on it."  (Defs.' Reply Br. at 11.)

[6]     A copy of this formal grievance form is in the record.  (See Ex. E, ECF No. 55-35).  The grievance form recounts that (i) Officer Schmitt urinated on Seweid; and that (ii) Officers Cruz and Destefano stood in "close proximity outside the cell," "watched Schmitt," "laughed at [his urination,] and let him do it."  (Id.)  Defendants argue that the Court cannot consider the formal grievance form for the truth of those assertions because the form is "inadmissible hearsay."  (Defs.' Reply ¶ 21 (citing FED. R. EVID. 801).)  At this time, it is unnecessary for the Court to determine the purposes for which the grievance form may be admissible.  Even if the Court did not consider the grievance form, Seweid's deposition testimony and affidavit are sufficient on their own to preclude summary judgment.

Defendants deny all of this, noting that Seweid's written sick call request is actually dated October 26, 2018—nine days after the incident.  (See Defs.' Reply ¶ 22.)  There, it is undisputed that Seweid requested "dandruff shampoo and something for [his] face breaking out," with no mention of urine.  (Defs.' 56.1 ¶ 41.)   This was similar to a sick call request that Seweid made on September 4, 2018, about six weeks before the incident.  (Id.)  Seweid stated in that sick call request: "I am getting [an] [a]llergic reaction from the blanket[,] my eyes are itching[,] and I have a bite on my shoulder."  (Id. ¶ 37.)  Medical staff examined Seweid on September 7, 2018, and noted that he had "itchy eyes, [a] rash, itchy skin," and "dandruff."  (Id. ¶ 38.)  A physician noted that Seweid "had a special need for a cotton blanket and prescribed him Selsun Blue," an antidandruff shampoo.  (Id. ¶ 39.)

**B.**    **Procedural History**.

On July 1, 2021, Seweid filed a Complaint against Defendants, bringing 14 causes of action under 42 U.S.C. § 1983.  (See Compl., ECF No. 1.)  Seweid alleged claims of: (1) "excessive and unreasonable use of force;" (2) involuntary servitude; (3) abuse of process; (4) failure to intervene; (5) fabrication of evidence; (6) unlawful seizure/denial of bodily integrity; (7) due process; (8) retaliation; (9) conspiracy; (10) failure to supervise; (11) failure to report abuse of rights; (12) failure to discipline; (13) failure to provide timely and adequate medical care; and (14) other "municipal violations."  (See id. at 10–29.)  The parties engaged in discovery for almost a year. (Compare ECF No. 13, with ECF No. 26.)

On February 14, 2023, Defendants—then represented by the Nassau County Attorney's Office—filed an untimely pre-motion letter in anticipation of its motion for summary judgment.[7] (See ECF No. 28.)  Defendants' current private counsel filed a Notice of Consent to Change

---

[7]    On November 28, 2022, the Court entered a Scheduling Order stating: "[a]ny party seeking to make a dispositive motion shall initiate that process, consistent with the Individual Rules of the assigned District Judge, on or before January 12, 2023."  (11/28/2022 Scheduling Order.)

Attorney on May 10, 2023, which the Court so-ordered the next day.  (See ECF No. 31.)  The Court then granted Defendants' motion and held a pre-motion conference on June 7, 2023.  (See Ex. C., ECF No. 55-6.)  At the pre-motion conference, the Court denied Defendants' request to move for summary judgment because its predecessor counsel did not file a timely pre-motion letter.  (See id. at 3–8.)  Despite doing so, the Court noted that "some of [the causes of action] will get sorted out before we go to trial."  (Id. at 7.)  After directing the parties to Magistrate Judge Shields for settlement purposes, the Court scheduled trial for October 16, 2023.  (See id. at 6–8.)

Indeed, various pretrial conferences and stipulations between counsel ultimately narrowed the claims-to-be-tried to two: excessive force against Officer Schmitt (Count I) and failure to intervene against Officers Destefano and Cruz (Count IV).[8]

On October 5, 2023—eleven days before trial—Seweid's counsel moved the Court to execute a Writ of Habeas Corpus Ad Testificandum to produce Seweid from the Metropolitan Detention Center ("MDC") in Brooklyn for each trial day.  (See ECF No. 46.)  The Court granted the motion the next day.  (See ECF No. 47.)  At a pretrial conference on October 11, 2023, the Court questioned whether Seweid was housed in MDC.  (See Ex. F at 10, ECF No. 55-9.)  Defense

---

[8]       For example, Seweid withdrew his claim for conspiracy (Count IX) when the parties submitted their Joint Pretrial Order ("JPTO").  (See Ex. D at 3, ECF No. 55-7.)  Further, at a pretrial conference on September 27, 2023, the Court bifurcated the Monell claims—including failure to supervise (Count X), failure to report abuse (Count XI), and failure to discipline (Count XII)—from the trial of the underlying incident.  (See Ex. E at 3–4, ECF No. 55-8.)  At the same conference, the Court also listed the claims to be dismissed prior to trial: involuntary servitude (Count II); abuse of process (Count III); fabrication of evidence (Count V); unlawful seizure/denial of bodily integrity (Count VI); and due process (Count VII).  (See id. at 4–6.)  Defense counsel argued that the claims against Corporal Sewer should be dismissed because the sole claim against him was that he had not conducted a nighttime check after the incident occurred.  (See id. at 7.)  Although the Court indicated, "I would agree with you," it directed the parties to meet-and-confer on the issue of dismissing (i) the claims against Corporal Sewer; and (ii) any other remaining claims.  (See id.)

The Court held a further pretrial conference on October 11, 2023, where the parties agreed that the only remaining claims to be tried—at the initial phase—were the excessive force claim (Count I) and the failure to intervene claim (Count IV).  (See Ex. F at 3–4, ECF No. 55-9.)  At that point (five days before trial), Seweid's counsel still had not decided whether to voluntarily discontinue the claim against Corporal Sewer.  (See id. at 4.)  But as explained below, no cause of action remains against Corporal Sewer because the parties agreed to dismiss the only claim levied against him (Count VII (due process)).  (See id. at 3–4.)

counsel noted online records reflected Seweid was incarcerated at Cayuga Correctional Facility in Upstate New York.[9]  (See id.)  And so, later that day, Seweid's counsel sought—and the Court promptly executed—a new Writ of Habeas Corpus Ad Testificandum to have Seweid produced for trial from Cayuga Correctional Facility.  (See ECF No. 49.)

On October 12, 2023, the Court held a sua sponte pretrial conference.  (See Ex. G, ECF No. 55-10.)  There, the Court conveyed the U.S. Marshals Office's message that it would need between 5–7 business days to produce Seweid from Cayuga Correctional Facility to Fishkill Correctional Facility (from which he would need daily transportation to Central Islip for trial).  (See id. at 2.)  Because there was insufficient time to produce Seweid before the October 16, 2023, trial date, the Court adjourned the trial and rescheduled it for December 11, 2023.  (See id. at 3.)

Given the failure of Seweid's counsel to timely arrange for his appearance at trial, Defense counsel renewed its request to move for summary judgment on the two now-remaining claims.[10]  (See id. at 3–4.)  The Court asked about the basis for the motion, granted the request, and set a briefing schedule.  (See id. at 4–6; see also ECF No. 51.)  On November 17, 2023, Defendants filed the fully briefed summary judgment motion on behalf of all parties.  (See ECF No. 55.)

## II.    DISCUSSION

### A.    Standard of Review.

The standard for granting summary judgment is well established.  Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no

---

[9]      Seweid's incarceration at NCCC began on August 28, 2018.  (See Defs.' 56.1 ¶ 6.)  He was released from NCCC on November 2, 2018.  (See id. ¶ 8.)  After his released, Seweid was arrested on federal charges on September 30, 2020.  (See id. ¶ 10.)  As of Seweid's May 6, 2022, deposition, he had been continually incarcerated at MDC since his arrest on September 30, 2020.  (See id. ¶ 11.)  Since April 20, 2023, Seweid has been incarcerated at Cayuga Correctional Facility in Upstate New York.  (See id. ¶ 12.)

[10]      In doing so, Defendants also seek dismissal of (i) the bifurcated Monell claims and (ii) Corporal Sewer and Nassau County Sheriff's Department as defendants.  (See Defs.' Br. 14—18.)

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," Celotex Corp., 477 U.S. at 323, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins., 472 F.3d 33, 41 (2d Cir. 2006) (quoting FED. R. CIV. P. 56(e)).

When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. See Vt. Teddy Bear Co., v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). In considering "what may reasonably be inferred" from evidence in the record, however, the Court should not afford the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Cnty. of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990) (internal quotation omitted). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, . . . conclusory statements, conjecture, or speculation by the party resisting the motion

---

[11]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. See FED. R. CIV. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) . . . chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

will not defeat summary judgment." Kulak v. City of N.Y., 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing Matsushita, 475 U.S. at 587).

**B.     Analysis.**

Here, Defendants move for summary judgment on Seweid's two remaining claims—namely—excessive force against Officer Schmitt and failure to intervene against Officers Destefano and Cruz.  Defendants also seek a ruling that dismisses (i) Corporal Sewer as a defendant; (ii) the Sheriff's Department as a defendant; and (iii) the bifurcated Monell claims.  For the below reasons, the Court denies Defendants' summary judgment motion, dismisses Corporal Sewer and the Sheriff's Department from the case, and declines to dismiss the bifurcated Monell claims.

**1.     Defendants are Not Entitled to Summary Judgment on Seweid's Excessive Force Claim.**

The Court begins with Seweid's claim that Officer Schmitt's alleged urination constituted constitutionally excessive force in violation of the Fourth Amendment.[12]  (See Compl. ¶¶ 38–43, ECF No. 1.)  Defendants marshal three arguments in response.  First, Defendants argue that Seweid does not have a viable excessive force claim on the merits.  (See Defs.' Br 5–9.)  Second, Defendants argue that—even if Seweid has a valid excessive force claim—Officer Schmitt is entitled to qualified immunity.  (See Defs.' Br 15–17.)  Third, Defendants argue that—even if Seweid has a valid excessive force claim and even if Officer Schmitt is not entitled qualified immunity—the Prisoner Litigation Reform Act ("PLRA") precludes his claim from going forward. (See Defs.' Br 9–12.)  The Court takes each argument in turn.

---

[12]     Seweid's Complaint alleges an excessive force claim against Officers Schmitt, Destefano, and Cruz.  (See Compl. ¶¶ 39–40, ECF No. 1.)  But as mentioned, at a pretrial conference on October 11, 2023, the parties agreed to limit Seweid's excessive force claim to against Officer Schmitt only.  (See Ex. F at 3–4, ECF No. 55-9.)

a)   *Excessive Force.*

(1)   Applicable Law.

Analysis of an excessive force claim brought under § 1983 begins by identifying "the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989).  On October 17, 2018, Seweid was jailed in the NCCC as a convicted and sentenced inmate.  (See Defs.' 56.1 ¶¶ 6–7 (citing Ex. M, ECF No. 55-16).) Accordingly, Seweid's right to be free from excessive force is protected by the Eighth Amendment's Cruel and Unusual Punishments Clause—not the Fourth Amendment as he contends.  See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999) ("[T]he Eighth Amendment's protection does not apply 'until after conviction and sentence.'") (quoting Graham, 490 U.S. at 392 n.6)); see also Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) ("In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments.").  Inmates enjoying Eighth Amendment protection against the use of excessive force may—as here—sue to recover damages for its violation under § 1983.  See Hudson v. McMillian, 503 U.S. 1, 9–10 (1992).

To prevail on an Eighth Amendment excessive force claim, a plaintiff must prove "two elements, one subjective and one objective."  Harris v. Miller, 818 F.3d 49, 63 (2d Cir. 2016) (quoting Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015)).

The subjective element "requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct."  Wright, 554 F.3d at 268 (quoting Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)).  "[T]he test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"

11

Harris, 818 F.3d at 63 (quoting Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003)).  "To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."  Scott, 344 F.3d at 291 (internal quotation marks and citation omitted). "Accordingly, determining whether officers used excessive force necessarily turns on the need for the force used."  Harris, 818 F.3d at 64 (emphasis in original).  For example, a plaintiff may satisfy the subjective element by showing that "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct," as the mistreatment alone may, "in some circumstances, be sufficient evidence of a culpable state of mind."  Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997); Mustafa v. Pelletier, 2023 WL 7537625, at *1 (2d Cir. Nov. 14, 2023).

As for the objective element, "[the inmate] must allege that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions."  Harris, 818 F.3d at 64 (internal quotation marks and citation omitted).  This inquiry is context specific and "depends upon the claim at issue" because "the Eighth Amendment's prohibition of cruel and unusual punishments draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." Hudson, 503 U.S. at 8 (internal quotation marks omitted).  The Second Circuit has nonetheless described "the malicious use of force to cause harm" as constituting a "per se" violation of the Eighth Amendment, "because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated."  Harris, 818 F.3d at 64 (internal quotation marks omitted).  Thus, the objective element "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury, as long as the amount of force used is not de minimis."  Id. (internal quotation marks omitted).  As an

12

objective matter, "de minimis uses of physical force" cannot support a constitutional claim, "provided that the use of force is not of a sort repugnant to the conscience of mankind."[13]  Hudson, 503 U.S. at 9–10 (internal quotations omitted).

Applying this two-part test, where there is sufficient evidence for a rational factfinder to conclude that officers "used force maliciously and sadistically," the Second Circuit has reversed grants of summary judgment to defendants "even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak."  Wright, 554 F.3d at 269; see also Gunn v. Beschler, 2023 WL 2781295, at *2 (2d Cir. Apr. 5, 2023).  That's because the "core judicial inquiry"—which puts in issue both the objective and subjective elements of the Eighth Amendment standard—is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (quoting Hudson, 503 U.S. at 7)).  "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."  Hudson, 503 U.S. at 7.

(2)  Analysis.

To begin, the Court recognizes an argument can be made that Seweid's Eighth Amendment claim sounds more in conditions of confinement than it does in excessive force.  Seweid does not allege that he experienced physical pain when Officer Schmitt urinated on him.  Seweid also does not allege he sustained his face rash directly from Office Schmitt's urination on his person.  Rather, Seweid contends he sustained the rash after being exposed to the urination—either from sleeping

---

[13]     As the Supreme Court has explained, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  Hudson, 503 U.S. at 9 (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (Friendly, J.) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").  That said, "although not every malevolent touch by a prison guard gives rise to a federal cause of action, the Eighth Amendment is offended by conduct that is repugnant to the conscience of mankind."  Crawford, 795 F.3d at 256 (internal quotation marks and citation omitted).

on his mattress the evening of October 17, 2018, or from using his towel on October 18, 2018.
(See Seweid 56.1 ¶ 22; see also Seweid Dep. Tr. at 66–67.))  Seweid's Complaint, however, only
alleges an excessive force claim.  As a result, the Court analyzes Seweid's claim under the Eighth
Amendment's excessive force framework.

Construing the facts in Seweid's favor, as the Court must at summary judgment, presents
genuine disputes of material fact as to the subjective and objective elements of Seweid's Eighth
Amendment excessive force claim.  Accordingly, the Court denies Defendants' motion for
summary judgment with respect to the merits.

(a)   <u>Subjective Element.</u>

Beginning with the subjective element, the Court evaluates the record to determine whether
a genuine dispute of material fact exists as to whether Officer Schmitt applied force with a
sufficiently culpable state of mind.  As an introductory point, the Court highlights that answering
this question will concomitantly answer whether a genuine dispute exists on the "core judicial
inquiry" of an excessive force claim: "whether force was applied in a good-faith effort to maintain
or restore discipline," or rather "maliciously and sadistically to cause harm."  Wilkins, 559 U.S. at
37 (internal quotations omitted).

Here, a nurse employed by the Sherriff's Department "requested that the Correction[al]
Officers lock down the cells while he distributed medication to the detainees."  (Seweid 56.1 ¶ 4.)
It is undisputed Seweid told the nurse—while receiving his medication—that locking down the
cells was a "punk move."  (Seweid 56.1 ¶ 6.)  Seweid testified that—soon after making the
comment—Officer Schmitt asked Seweid if he had "a problem" while conducting patrol around
the cells.  (Seweid Dep. Tr. at 27.)  Seweid responded "no."  (Id.)  According to Seweid's testimony,
Officer Schmitt then told him "now you got a fucking problem" before walking away.  (Id.)

14

Soon after, Seweid testified Officers Schmitt, Cruz, and Destefano approached his jail cell and told him to "put his hands behind [his] head," to "turn around," and to "back out of his cell." (Id. at 39.)  After complying, Seweid testified he was "frisked," "handcuffed behind [his] back," and "placed on the wall right next to [his] cell."  (Id.)  Then, Seweid testified Officer Schmitt went inside his cell and "conducted a search."  (Id. at 42.)  Seweid attested he heard—but did not see— Officer Schmitt throwing things around inside his cell.  (See id. at 43.)  After being uncuffed by Officer Cruz, Seweid testified Officer Schmitt told him to "clean th[e] shit up" inside his cell.  (Id. at 44–45.)  As he knelt to pick up his belongings, Seweid testified that Officer Schmitt urinated on his personal property and on "the back of [his right] leg."  (Id. at 48.)  Immediately after the incident occurred, Seweid attested Officer Schmitt told him that he was "not such a tough guy anymore" before closing the cell door.  (Id.)

Accepting Seweid's allegations as true, as the Court must at this phase, there is a genuine dispute of fact as to whether Officer Schmitt acted with "the necessary level of culpability."  Harris, 818 F.3d at 63.  Reasonable jurors may infer that Officer Schmitt did not act to "maintain or restore discipline."  Id. at 63.  Rather, they may infer that Officer Schmitt acted "maliciously and sadistically to cause harm" in response to Seweid's "punk move" comment.  Id.  That's because Seweid alleges specific facts permitting an inference that "[n]o reasonably perceived penological need existed" for Officer Schmitt's alleged conduct in Seweid's cell.  Hogan v. Fischer, 738 F.3d 509, 516 (2d Cir. 2013).  Officer Schmitt denies that the interaction took place; he does not claim that there was a legitimate reason for him to have urinated in Seweid's cell and on his person.  (See Defs.' 56.1 at p. 1 n.1.)  Given the parties' contrasting accounts of the episode, the Court finds genuine disputes of material fact exist as to the subjective element of Seweid's Eighth Amendment excessive force claim.  And so too, genuine disputes of material of fact exist as to excessive force's "core judicial inquiry."  Harris, 818 F.3d at 64 (noting the Second Circuit has described "the

malicious use of force to cause harm" as constituting a "per se" violation of the Eighth Amendment "as long as the amount of force used is not de minimis").

(b)    <u>Objective Element</u>.

The parties focus most of their attention on the objective element of the Eighth Amendment standard.  For their part, Defendants argue that Officer Schmitt's use of force—assuming his conduct qualifies as force—was de minimis and not of a kind that is repugnant to the conscience of mankind.  (See Defs.' Rep. Br. 15.)  Seweid disagrees, arguing the conduct was repugnant enough to satisfy the objective element.  (See Seweid Br. 7.)  Accordingly, as for the objective element, the Court evaluates the record to determine whether a genuine dispute of material fact exists as to whether Officer Schmitt's conduct amounts to a use of force so "repugnant to the conscience of mankind," such that it violates the Eighth Amendment.  Hudson, 503 U.S. at 10 (internal quotations omitted).

As mentioned, Seweid testified that Officer Schmitt urinated on his "bed," "sheets," "blankets," "books," "pictures," and most notably, on "the back of [his right] leg" near his calf. (See Seweid Dep. Tr. at 48.)  Officer Schmitt denies that the cell search ever took place.  (See Defs.' 56.1 at p. 1 n.1.)  It bears noting that Seweid's testimony describing the October 17, 2018, incident is "more than mere conclusory allegations subject to disregard; [it is] specific and detailed," and "made under penalty of perjury."  Scott, 344 F.3d at 289.  And it is not so "contradictory or rife with inconsistencies," even though other aspects of his story may be, "such that it [is] facially implausible."  Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010).  Thus, Seweid's "own sworn statement," even standing alone, "is adequate to counter summary judgment."  Scott, 344 F.3d at 290.

When construing the facts in Seweid's favor, there is sufficient evidence for a jury to find that Officer Schmitt's alleged urination was a use of force of the sort that is repugnant to the

16

conscience of mankind.  As Seweid notes, the most relevant decision is <u>Hogan v. Fischer</u>, 738 F.3d 509, 513 (2d Cir. 2013), where the Second Circuit held that an inmate stated a valid Eighth Amendment claim when he alleged that correctional officers sprayed him with a mixture of feces, vinegar, and machine oil, burning his eyes and leaving him with other physical injuries.  The Second Circuit was unwilling to accept, as a matter of law, that such conduct constituted only a <u>de minimis</u> use of force, and even if it did, the Court pointed out that it was "undoubtedly repugnant to the conscience of mankind."  <u>Id.</u> at 516 (internal quotation marks omitted).

The conduct alleged here—urinating on an inmate—is comparable to the conduct involved in <u>Hogan</u>.  Although this case involves the application of less force—in that it was not capable of inflicting similar harm (indeed, Seweid does not claim to have suffered any physical pain during the episode)—the indignity of being urinated on can be placed on the same level as being sprayed with a combination of human excrement, vinegar, and machine oil.  Both actions are unequivocally contrary to "contemporary standards of decency" and "repugnant to the conscience of mankind" in that they are similarly humiliating, degrading, and lacking a penological purpose.  <u>Crawford</u>, 796 F.3d at 256 ("Although not 'every malevolent touch by a prison guard gives rise to a federal cause of action,' the Eighth Amendment is offended by conduct that is 'repugnant to the conscience of mankind.'" (citations omitted)); <u>see also</u> <u>Hudson</u>, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... whether or not significant injury is evident." (internal citation omitted)).

Defendants cite several cases to support their argument that Officer Schmitt's alleged conduct is not an Eighth Amendment violation.  But none persuade.

For example, Defendants cite two recent summary orders from the Second Circuit— <u>Mustafa v. Pelletier</u>, 2023 WL 7537625 (2d Cir. Nov. 14, 2023), and <u>Animashaun v. Regner</u>, 2021 WL 4472665 (2d Cir. Sept. 30, 2021), <u>cert. denied</u>, 2022 WL 1295777 (U.S. May 2, 2022).  But

each of those cases involve acts and circumstances that are incomparable to the conduct alleged here. In Mustafa, the Second Circuit held that an officer who purposefully "toss[ed]" or "spill[ed]" a cup of juice on an inmate was entitled to qualified immunity because there was a "mix of authority" about whether the conduct at issue was "de minimis as a matter of law." Mustafa, 2023 WL 7537625, at **2–3 (internal quotations omitted). In distinguishing Hogan, the Mustafa Court stressed that "the indignity of being splashed with juice cannot be placed on the same level as being sprayed with a combination of human excrement and noxious chemicals." Id. at *2. This case is different. Here, the indignity of being urinated on can be placed on the same level as the degrading and humiliating conduct in Hogan. At bottom, tossing a cup of juice on an inmate is not remotely analogous to urinating on an inmate.

The Second Circuit's decision in Animashaun is also clearly distinguishable. There, the Circuit held that an inmate failed to establish an Eighth Amendment claim when he alleged that an officer "verbally harassed him, spat on him, and threw an unknown green liquid that smelled like disinfectant on his skin."[14] Animashaun, 2021 WL 4472665, at **1–2 (citing Brandon v. Kinter, 938 F.3d 21, 42 (2d Cir. 2019); Hudson, 503 U.S. at 9)). But again, this case is different. The conduct at issue in Animashaun—however indecent—is incomparable to the degrading and humiliating act of an officer pulling down his pants and directly urinating on an inmate.

---

[14]    Although the summary order did not recount the particulars of Animashaun's claims, the underlying decision detailed his implausible allegations. See Animashaun v. Regner, 2019 WL 5540430, at *10 (N.D.N.Y. Sept. 26, 2019), report and recommendation adopted, 2020 WL 11563782 (N.D.N.Y. Jan. 21, 2020). For example, the plaintiff in Animashaun alleged that the defendant officer spat "on or at" him twice. Id. at *8. Yet somehow the spit was "all over" Animashaun's body and "everywhere in his cell," including on his bed sheet and towel. Id. The court detailed Animashaun's attempt to embellish his claim by pointing out that—during this incident—the officer never entered the cell, the plaintiff was at least eight steps from the cell door, and the officer "would have to have spit quit[e] a long way and an incredible amount to have covered plaintiff's body and all the property in his cell." Id. at *10. With respect to Animashaun's allegation that the officer threw an unknown green substance on him—which "immediately" irritated and burned his skin, resulting in discoloration, itching, and a rash—the court pointed to Animashaun's testimony that he made no effort to wash off the liquid for "[a]bout an hour." Id. at *9. This led the court to conclude that "[i]f the substance was not painful enough or irritating enough to wash off, clearly, [the officer's] conduct was not repugnant to the conscience of mankind." Id. at *10.

Defendants cite several district court decisions where no Eighth Amendment violation occurred.  Most of them are distinguishable from this case.  See, e.g., Hunter v. Frantz, 2011 WL 5325714, at *1, *3 (M.D. Pa. Nov. 3, 2011) (throwing of "rust and pipe sediment" from a plumbing system onto plaintiff's back, head, and neck failed to state an Eighth Amendment violation because the use of force was not "repugnant to the conscience of mankind"); Beauvoir v. Falco, 345 F. Supp. 3d 350, 370–71 (S.D.N.Y. 2018) (finding no Eighth Amendment violation where officer sprayed inmate with pepper spray "in the face . . . for a couple of seconds" after inmate repeatedly resisted multiple officers' orders).

Some of the district court decisions Defendants cite involve conduct constituting no more than de minimis action that is best described as harassment, not cruel and unusual punishment. See, e.g., Benitez v. Locastro, 2008 WL 4767439, at *5 (N.D.N.Y. Oct. 29, 2008) ("allegation[s] that officers threw dirty mop water into Plaintiff's cell and overflowed his toilet, even assuming they are true, constitute no more than de minimis actions best described as harassment"); Hamilton v. Fischer, 2013 WL 3784153, at *15 (W.D.N.Y. July 18, 2013) (officers urinating into an air vent of inmate's cell once constitutes no more than a de minimis action "best described as harassment, not cruel and unusual punishment").  These cases are factually distinguishable from this case because Seweid alleges that Officer Schmitt's conduct contacted his person.

Several of the district court decisions Defendants cite have been rendered unpersuasive by subsequent Second Circuit decisions.  For example, Defendants cite Tafari v. McCarthy, where the district court held that an officer did not violate the Eighth Amendment when he allegedly threw a cup of "urine and feces" on an inmate.  714 F. Supp. 2d 317, 341 (N.D.N.Y. 2010).  In that case, the court reasoned that the conduct, "while certainly repulsive, is not sufficiently severe to be considered repugnant to the conscience of mankind."  Id. (internal quotation marked omitted). Defendants also cite Fackler v. Dillard, an Eastern District of Michigan case where the court held

that an officer did not violate the Eighth Amendment when he allegedly threw a cup of urine through an inmate's food slot, resulting in urine splashing "on her face and on her clothing." 2006 WL 2404498, at *1, *3 (E.D. Mich. Aug. 16, 2006). The court considered the conduct a "de minimis use of force" that did not violate the Eighth Amendment. Id. at *3. The Second Circuit in Hogan, however, vacated the judgment of an underlying district court decision that relied on Tafari and Fackler to dismiss an inmate's Eighth Amendment excessive force claim. See Hogan, 738 F.3d at 514. This Court therefore does not find those two decisions persuasive; Hogan rejected their logic.[15] The same goes for Defendants' citation to Young v. Poff, a pre-Crawford decision which held that the "grop[ing]" of inmate by an officer "during a single pat frisk" did "not rise to the federal constitutional proportions to state an Eighth Amendment violation." 2006 WL 1455482, at *4 (W.D.N.Y. May 22, 2006).

As a final matter, in their papers, the parties seem to disagree about whether Officer Schmitt's urination on Seweid constitutes "force" of any kind for Eighth Amendment purposes. The parties briefly contend that such conduct either does or does not, but neither one fully analyzes the issue. (Compare Defs.' Rep. Br. 1, with Seweid Br. 11–12.) To the extent Defendants argue that Officer Schmitt's urination cannot trigger an excessive force claim because it does not constitute "force," the Court disagrees. From Seweid's testimony—that Officer Schmitt directly urinated on "the back of [his right] leg"—a reasonable juror could easily conclude that Officer Schmitt's conduct involved some modicum of force for Eighth Amendment purposes. (Seweid Dep. Tr. at 48.)

---

[15]     See also Moody v. Shoults, 2016 WL 8465004, at *4 (M.D. Ga. Jul. 28, 2016), report and recommendation adopted in relevant part, rejected in part, 2017 WL 626367 (M.D. Ga. Feb. 15, 2017) (finding that plaintiff's allegations that an officer "threw bodily fluids on him, including human feces and urine" stated an Eighth Amendment excessive force claim—reasoning that, in Hogan, the Second Circuit "rejected Tafari's logic").

Defendants do not cite—and the Court has not found—any Eighth Amendment excessive force case where a court has concluded that contact with an inmate did not constitute "force." Rather—where any force is applied (directly or indirectly) or where any inmate contact occurs—courts focus on whether the contact at issue rises above a de minimis use of force.  See Harris, 818 F.3d at 64 (holding the objective element "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury, as long as the amount of force used is not de minimis").  If the force employed is de minimis, courts then examine whether the use of force is "of a sort repugnant to the conscience of mankind" such that it violates the Eighth Amendment. Hudson, 503 U.S. at 9–10 (internal quotations omitted).

The Second Circuit's decision in Hogan—which held that "spraying an inmate with vinegar, excrement, and machine oil constitutes" more than a de minimis use of force—impels this Court to conclude that directly urinating on an inmate also constitutes an application of force.  738 F.3d at 515–16.  The Hogan Court's citation to Samuels v. Hawkins supports this conclusion.  157 F.3d 557, 558 (8th Cir. 1998) (per curiam) (holding that a prison official throwing a cup of water at prisoner was de minimis use of force).  These decisions indicate that once a corrections officer contacts an inmate (directly or indirectly), an application of force is presumed, and the dispositive Eighth Amendment question becomes whether the use of force was de minimis or of a sort that is repugnant to the conscience of mankind.[16]  The way in which an officer contacts an inmate, or the amount of material that contacts an inmate's body, is ultimately immaterial.

---

[16]     The Court also notes that several of the district court cases cited by Defendants above—including Tafari, Fackler, and Hunter—also undermine Defendants' argument that Officer Schmitt's urination on Seweid did not constitute "force" for Eighth Amendment purposes.  These three decisions assume—albeit without opining on the issue directly—that similar conduct involved some application of "force."  But each decision ultimately concludes that the Eighth Amendment was not violated because the use of force was either de minimis or of a kind that was not repugnant to the conscience of mankind.  See also Baltas v. Dones, 2022 WL 1239989, at *11 (D. Conn. Apr. 27, 2022) (indicating that an officer throwing "soap, toilet paper and trash at" an inmate "only raise[d] an inference that Officer Savoie subjected [the inmate] to a de minimis use of force that may be objectionable but is not repugnant to the conscience of mankind") (internal quotation marks omitted).

Defendants' argument that an officer directly urinating on an inmate does not constitute "force" is also undercut by intra and extra-Circuit precedent establishing that humiliating and degrading contact with an inmate can also violate the Eighth Amendment.  See Crawford, 796 F.3d at 254 ("A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or to humiliate the inmate, violates the Eighth Amendment.") (emphasis added)); see also Washington v. Hively, 695 F.3d 641, 643 (7th Cir. 2012) (Posner, J.) ("An unwanted [and brief] touching of a person's private parts, intended to humiliate the victim ..., can violate a prisoner's [Eighth Amendment] constitutional rights whether or not the force exerted by the assailant is significant.") (emphasis added)); Hogan, 738 F.3d at 516 (citing Hively and stressing the humiliation aspect of its holding).

Considering the foregoing, the Court finds that genuine disputes of material of fact exist on the objective element of Seweid's Eighth Amendment excessive force claim.

<b>b)</b>  <i>Qualified Immunity.</i>

Next, the Court considers Defendants' argument that Officer Schmitt is entitled to qualified immunity on Seweid's excessive force claim.  (See Defs.' Br. 15–17.)

(1)  Applicable Law.

"Qualified immunity provides government officials 'immunity from suit rather than a mere defense to liability.'"  Looney v. Black, 702 F.3d 701, 705 (2d Cir. 2012) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  "[T]he familiar standards that govern resolution of motions for summary judgment apply equally to such motions based on an assertion of qualified immunity."  Sloley v. VanBramer, 945 F.3d 30, 36 (2d Cir. 2019) (citing Tolan v. Cotton, 572 U.S. 650, 656–57 (2014)).  Courts "evaluate claims of qualified immunity at summary judgment using a two-part inquiry: (1) 'whether the facts, taken in the light most favorable to the party asserting the injury,

22

show the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'"[17]  Id. (quoting Tolan, 572 U.S. at 656).  In determining whether qualified immunity exists, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson, 555 U.S. at 236.

With respect to the second prong, "[c]learly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."[18]  Dist. of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal quotations omitted).  To determine whether a right is clearly established, district courts consider "Supreme Court decisions, [Second Circuit] decisions, and decisions from other circuit courts."  Simon v. City of N.Y., 893 F.3d 83, 92 (2d Cir. 2018).  That is not to say, however, that courts "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  Id. at 63–64 (internal

---

[17]     Sometimes the qualified immunity inquiry requires courts to consider a third issue.  "[E]ven if right was 'clearly established'" at the time of the alleged violation, a court can still bar suit where "it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful."  Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013) (quoting Taravella v. Town of Wolcott, 599 F.3d 129, 133–34 (2d Cir. 2010)).

[18]     In other words, this prong of the qualified immunity analysis turns on two related questions: first, whether the precise contours of the right at issue were clearly established; and second, whether it was objectively reasonable for the defendant to believe that his actions complied with that clearly established law.  See Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) ("Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." (internal quotation marks and citation omitted)).

quotations omitted).   In other words, the clearly established right "must be defined with specificity."  City of Escondido, Cal. v. Emmons, 586 U.S. 501, 503 (2019).  For example, merely defining the right at issue as the "right to be free of excessive force" is "far too general."  Id.  Here, where Seweid—a convicted and sentenced prisoner—brings a claim "that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments."  Wright, 554 F.3d at 268; see also U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").   Seweid's excessive force "claim must 'be judged by reference to this specific constitutional standard, rather than to some generalized 'excessive force' standard.'"[19]  Id. (quoting Graham, 490 U.S. at 394) (alterations omitted)).

Qualified immunity is usually a game of find-that-case, but not always.  Common sense still plays a role.  This Court can examine, for example, whether qualified immunity applies based on the "obviousness" of the alleged Constitutional violation—even in the absence of a controlling case exactly on point.  See Taylor v. Riojas, 592 U.S. 7 (2020) (per curiam).  When the Supreme Court handed down Taylor v. Riojas in 2020, summarily reversing the Fifth Circuit's grant of qualified immunity to a prison official, it "introduced a measure of jurisprudential noise."[20]  The order marked the first time in nearly twenty years that the Supreme Court expressly found official misconduct to violate "clearly established" law (the Eighth Amendment).  See Taylor, 592 U.S. at

---

[19]      This makes sense because excessive force claims brought under the Eighth Amendment (by a prisoner post-conviction and sentence) and the Fourteenth Amendment (by a pretrial detainee) are subject to different standards.  See Ross v. Willis, 2021 WL 3500163, at *9 (S.D.N.Y. Aug. 9, 2021).  In contrast to such claims brought by a prisoner under the Eighth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  Kingsley v. Hendrickson, 576 U.S. 389, 396–97 (2015).  The Second Circuit previously required pretrial detainees asserting excessive force claims to satisfy subjective and objective requirements.  See Carmona v. City of N.Y., 2016 WL 4401179, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting Walsh, 194 F.3d at 49–50)).  However, in Kingsley, the Supreme Court removed the subjective component for pretrial detainees.  576 U.S. at 396–97.

[20]      Jennifer E. Laurin, Reading Taylor's Tea Leaves: The Future of Qualified Immunity, 17 DUKE J. CONST. L. & PUB. POL'Y 241, 245 (2022).

8–9.  The Supreme Court's reasoning was even more noteworthy.  Citing none of the rulings of recent years that emphasized lower courts' obligation to identify factually analogous cases, the Court instead cited its long-neglected decision in Hope v. Pelzer, 536 U.S. 730 (2002).  See id.  In that case, the Supreme Court cautioned against an unduly restrictive conceptualization of clearly established law and stated that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[21]  Hope, 536 U.S. at 741.  Taylor invoked Hope in concluding that "no reasonable correctional officer could have concluded" the defendant's conduct—keeping Taylor in a pair of disturbingly unsanitary cells for six full days—was "constitutionally permissible," quoting the case for the proposition that "'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.'"  Taylor, 592 U.S. at 8–9 (quoting Hope, 536 U.S. at 741).

Though a rarity, Taylor was not a one-off.  The Supreme Court would go on later in the 2020 Term to vacate and remand another Fifth Circuit grant of qualified immunity in McCoy v. Alamu (an Eighth Amendment excessive force case).  141 S. Ct. 1364 (mem.) (2021).  There, the Supreme Court issued a "grant, vacate, and remand" order directing the Fifth Circuit to reconsider its decision "in light of Taylor v. Riojas"—a move that some observers have taken to indicate that Taylor is no fluke, but the harbinger of some shift in the Court's approach to qualified immunity.[22]

---

[21]     Despite the Supreme Court's recognition of an obviousness standard in Hope, the Court seemed to back away from it in subsequent cases.  In al-Kidd, for example, the Supreme Court did not even acknowledge Hope's existence, even though the lower court had primarily relied on Hope in its decision.  See Morgan v. Swanson, 659 F.3d 359, 373 (5th Cir. 2011) (citing al-Kidd v. Ashcroft, 580 F.3d 949, 970 (9th Cir. 2009), rev'd, 563 U.S. 731 (2011)).  The Supreme Court has, however, occasionally reaffirmed the existence of the obviousness standard.  See Wesby, 583 U.S. 48 (2018); Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam).  But until Taylor, the Supreme Court had never relied on the obviousness of a constitutional violation to overturn qualified immunity, regardless of case law on point.

[22]     See, e.g., Colin Miller, The End of Comparative Qualified Immunity, 99 TEX. L. REV. ONLINE 217, 224 (2021) ("[C]omparative qualified immunity analysis might have met its end in the Supreme Court's summary disposition in McCoy v. Alamu . . . . significantly shr[inking] the qualified immunity defense and expand[ing] the constellation of cases in which citizens can vindicate violations of their constitutional rights."); Joanna C. Schwartz, Qualified Immunity and Federalism All the Way Down, 109 GEO. L.J. 305, 351 (2020) ("The Court's decision in

25

Id.  In this Court's view, the Supreme Court's reliance on <u>Taylor</u> confirms that the high court "does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."  <u>Ramirez v. Guadarrama</u>, 2 F.4th 506, 523 (5th Cir. 2021) (Willett, J., dissenting in denial of rehearing en banc).  The Supreme Court's message in <u>Taylor</u> and then in <u>McCoy</u> was "low-key but loaded."  <u>Id.</u>

Accordingly, this Court can invoke <u>Taylor</u>'s revival of <u>Hope</u>'s obviousness principle to examine whether the Eighth Amendment can apply with "obvious clarity" to Officer Schmitt's alleged conduct in the absence of a controlling case on point.  In that case, the Court would consider whether "any reasonable officer should have realized that" the conduct alleged here—urinating on an inmate—"offended the Constitution."  <u>Taylor</u>, 592 U.S. at 9.

(2)    Analysis.

(a)    <u>It is Clearly Established that Officer Schmitt's Alleged Conduct Violates the Eighth Amendment.</u>

Here, Defendants argue Officer Schmitt is entitled to qualified immunity because it is not clearly established that the conduct alleged, if true, would violate the Eighth Amendment.  (<u>See</u> Defs.' Br. 16.)  The Court disagrees.

With respect to the first prong of the qualified immunity inquiry, the Court has already determined that—taking the facts in the light most favorable to the non-movant—Seweid established adequate evidence to preclude summary judgment on his Eighth Amendment claim.  So the first prong of the qualified immunity inquiry is satisfied.

---

<u>Taylor</u> sends the signal to lower courts that they can deny qualified immunity without a prior case on point—a very different message than the Court has sent in its recent qualified immunity decisions.").

With respect to the second prong, Seweid also adduced adequate evidence that Officer

Schmitt violated his clearly established Eighth Amendment rights.[23]   In October 2018, it was

clearly established that prison officials violate the Eighth Amendment when they "use force to

---

[23]     The Court's discussion below focuses on the Supreme Court, Second Circuit, and sister circuit precedents that are most relevant to qualified immunity issue in this case.  Several of the cases that both parties cite are either (i) clearly distinguishable from the instant case; or (ii) do not constitute clearly established law—as of October 2018—on the question of whether urinating on an inmate's leg constitutes "force" for Eighth Amendment purposes or whether, more generally, the alleged conduct at issue here violates the Eighth Amendment's prohibition on excessive force amounting to punishment.

Several of the cases Seweid cites are not Eighth Amendment excessive force cases at all.  See, e.g., Thompson v. Souza, 111 F.3d 694, 701 (9th Cir. 1997) (Fourth and Fourteenth Amendment strip search claim); Harrison v. Barkley, 219 F.3d 132 (2d Cir. 2000) (Eighth Amendment deliberate indifference claim); Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2021) (Eighth Amendment conditions of confinement claim); Walker v. Schult, 717 F.3d 119, 125–26 (2d Cir. 2013) (same); Allen v. Stanislaus Cty., 2017 WL 1255037, *11 (E.D. Cal. Feb. 3, 2017) (denial of outdoor exercise claim); Locurto v. Safir, 264 F.3d 154 (2d Cir. 2001) (First Amendment claim and Fourteenth Amendment Due Process claim); Nelson v. McGrain, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) (First Amendment retaliation claim).  These distinctions matter because the Supreme Court has "repeatedly" instructed lower courts to avoid defining rights at "a high level of generality."  al-Kidd, 563 U.S. at 742.

The cases cited by Seweid that implicate Eighth Amendment excessive force, meanwhile, are distinguishable from the circumstances here; each involve obvious uses of physical force that directly caused physical pain and/or physical injury.  See, e.g., Romano v. Howarth, 998 F.2d 101, 104 (2d Cir. 1993) (officer allegedly charged into inmate's cell with a body shield, knocked him against the cell wall, threw him to the ground, punched him in the jaw, and stomped repeatedly on his hands); Hudson, 503 U.S. at 4 (one officer punched inmate "in the mouth, eyes, chest, and stomach while [another officer] held the inmate in place and kicked and punched him from behind"); Hill v. Crum, 727 F.3d 312, 315 (4th Cir. 2013) (officer punched inmate "in the abdomen and ribs, and elbow[ed] the side of his head"); Gibeau v. Nellis, 18 F.3d 107, 109 (2d Cir. 1994) (officer struck inmate "approximately three times in the head with a six-inch long, one-half-inch diameter flashlight"); DeSpain v. Uphoff, 264 F.3d 965, 970, 977–78 (10th Cir. 2001) (officer "indiscriminately discharged pepper spray into the unit in which [plaintiff] was housed" through which the inmate was "exposed to the spray," suffering "burning skin and lungs with congested breathing and tearing eyes"); Egegbara v. Ponte, 2017 WL 6463006, at *2 (E.D.N.Y. Dec. 15, 2017) (officer locked inmate in a small shower area and then "turned on hot boiling water" causing inmate to sustain a first-degree burn on his face); Mustafa v. Stanley, 2022 WL 4120781 (D. Conn. Sept. 9, 2022), rev'd, 2023 WL 7537625 (2d Cir. Nov. 14, 2023); Ellis v. Catalano, 2020 WL 1956963 (S.D.N.Y. Apr. 23, 2020).

Defendants rely heavily on district court decisions that do not constitute clearly established law for qualified immunity purposes.  See Simon, 893 F.3d at 92 (holding that district courts consider "Supreme Court decisions, [Second Circuit] decisions, and decisions from other circuit courts" to determine whether a right is clearly established.)  These district court decisions are doubly irrelevant because—as discussed earlier—they have been rendered unpersuasive by subsequent Second Circuit decisions like Hogan and Crawford, among others.

The Second Circuit Eighth Amendment excessive force cases that Defendants do cite either postdate the conduct at issue or involve circumstances clearly distinguishable from this case.  For example, the Second Circuit's decisions in Mustafa and Animashaun post-date Officer Schmitt's conduct, and in any event, involve circumstances incomparable to the conduct at issue here.  So both summary orders have no bearing on whether the law prohibiting Officer Schmitt's conduct is clearly established.  Defendant's citation to the Second Circuit's decision in Boddie v. Schnieder is also clearly distinguishable from the facts of this case.  105 F.3d 857, 862 (2d Cir. 1997) (finding that inmate's allegations "that he was bumped, grabbed, elbowed, and pushed" by corrections officers considered force but insufficient to "approach an Eighth Amendment claim").

27

cause harm maliciously and sadistically[.]" Wright, 554 F.3d at 269. It was also clearly established that "the malicious use of force to cause harm" constituted a "per se" violation of the Eighth Amendment. Harris, 818 F.3d at 64. As explained above, there is a genuine dispute of fact about whether Officer Schmitt acted maliciously and sadistically in response to Seweid's "punk move" comment. But that is not enough, standing alone, to preclude Defendants' qualified immunity defense. That's because "de minimis uses of physical force" only violate the Eighth Amendment if "the use of force is . . . of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 10 (internal quotations omitted). Thus, the relevant inquiry is whether it was clearly established (in October 2018) that urinating on an inmate constitutes more than a de minimis use of force, or that it amounts to a use of force so repugnant to the conscience of mankind, such that it violates the Eighth Amendment.

Even assuming arguendo that urinating on an inmate is only a de minimis use of force, it was clearly established in October 2018 that Officer Schmitt's alleged conduct was repugnant to the conscience of mankind. Again, the most relevant decision is Hogan, where the Second Circuit held that correctional officers spraying an inmate with a mixture of feces, vinegar, and machine oil was "undoubtedly repugnant to the conscience of mankind." 738 F.3d at 516 (internal quotation marks omitted). Notwithstanding that the focus of this case is urinating on an inmate, and not spraying an inmate with feces, vinegar, and machine oil, the Second Circuit "has warned that 'an officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.'" Jones v. Treubig, 963 F.3d 214, 225 (2d Cir. 2020) (quoting Terebesi v. Torreso, 764 F.3d 217, 237 (2d Cir. 2014)) (internal alteration omitted). Here, a reasonable officer would be on notice that the conduct alleged—urinating on an inmate— is akin to the conduct involved in Hogan. Even if Seweid's distress arose more from humiliation and degradation than pain, it is beyond doubt that any reasonable police officer would know that

urinating on an inmate—like spraying an inmate with feces and chemicals—is "repugnant to the conscience of mankind and therefore violates the Eighth Amendment."  Hogan, 738 F.3d at 516 (citing Hill v. Crum, 727 F.3d 312, 323–24 (4th Cir. 2013) ("The types of actions that have been classified as 'repugnant to the conscience of mankind' are torture, humiliation, or degradation.") (internal citation and quotation marks omitted)).

As discussed above, Defendants tacitly argue that Officer Schmitt's urination on Seweid is not "force" for purposes of an Eighth Amendment excessive force claim.  (See generally Defs.' Rep. Br. 1.)  They do not argue, however, that the law is not clearly established on this point.  Even if the Court considered the issue for qualified immunity purposes, Defendants would not be entitled to the defense.

Admittedly, there is a dearth of caselaw opining what constitutes a sufficient application of "force" to trigger an Eighth Amendment excessive force analysis.  That makes sense.  Courts do not often (if ever) address the question because, as a practical matter, plaintiff's attorneys only bring excessive force cases where the application of force is obvious.  So unsurprisingly, there is no Supreme Court, Second Circuit, or sister circuit cases opining on this very specific legal issue involving the particular facts of Seweid's case.  Even so, there was sufficient controlling precedent in October 2018 to clearly establish that directly urinating on an inmate involves a use of "force" for Eighth Amendment purposes.

As discussed above, the Second Circuit in Hogan held that "spraying an inmate with vinegar, excrement, and machine oil" constitutes more than a de minimis use of force.  738 F.3d at 515–16.  Additionally, the Hogan Court cited the Eighth Circuit's decision in Samuels v. Hawkins for the proposition that throwing a cup of water at an inmate was a de minimis use of force.  See id. at 516 (citing Samuels, 157 F.3d at 558).  These decisions clearly establish—even without squarely opining on the "force" question—that directly urinating on an inmate also

constitutes an application of force.  That's because in every case where an officer contacts an inmate (directly or indirectly), an application of force is automatically presumed, and the dispositive Eighth Amendment question becomes whether the use of force was <u>de minimis</u> or of a sort that is repugnant to the conscience of mankind.  The way in which an officer contacts an inmate, or the amount of material that contacts an inmate's body, is ultimately immaterial.

The Court's conclusion that it is clearly established that an officer directly urinating on an inmate constitutes "force" is reinforced by intra and extra-Circuit precedent establishing that humiliating and degrading contact with an inmate can also violate the Eighth Amendment.  <u>See</u> <u>Crawford</u>, 796 F.3d at 254 ("A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or <u>to humiliate the inmate</u>, violates the Eighth Amendment.") (emphasis added)); <u>see</u> <u>also</u> <u>Hively</u>, 695 F.3d at 643 ("An unwanted [and brief] touching of a person's private parts, <u>intended to humiliate the victim</u> ..., can violate a prisoner's [Eighth Amendment] constitutional rights whether or not the force exerted by the assailant is significant.") (emphasis added)); <u>Hogan</u>, 738 F.3d at 516 (citing <u>Hively</u> and stressing the humiliation aspect of its holding).[24]

Given the above controlling precedents, the Court concludes that it was clearly established in October 2018 that: (i) directly urinating on inmate constitutes an application of "force" for Eighth Amendment purposes; and that (ii) Officer Schmitt's conduct, if true, was a use of force "repugnant to the conscience of mankind."  <u>Hudson</u>, 503 U.S. at 10 (internal quotations omitted).

---

[24]     The Seventh Circuit's decision in <u>Hively</u> can inform the Court's Eighth Amendment clearly established law analysis even though it is a Fourteenth Amendment excessive force claim concerning a pretrial detainee.  <u>See, e.g.</u>, <u>Ullery v. Bradley</u>, 949 F.3d 1282, 1296–97 (10th Cir. 2020).  This makes sense because <u>Hively</u> was decided pre-<u>Kingsley v. Hendrickson</u>.  576 U.S. 389, 396–97 (2015).  Before <u>Kingsley</u> was decided, the Second and Seventh Circuits required pretrial detainees asserting excessive force claims to satisfy subjective and objective requirements.  <u>See Kingsley</u>, 576 U.S. at 394–95; <u>see also</u> <u>Murray v. Johnson No. 260</u>, 367 F. App'x. 196, 198 (2d Cir. 2010).  Further, the Second Circuit's decision in <u>Hogan</u>—an Eighth Amendment excessive force case—cited <u>Hively</u> approvingly.  <u>See Hogan</u>, 738 F.3d at 516.

Although the Second Circuit has never opined on an Eighth Amendment excessive force claim involving Seweid's identical circumstances, the Court concludes that qualified immunity must be denied based on this summary judgment record and the clearly established law within the Second Circuit at the time of Officer Schmitt's conduct.  See Jones, 963 F.3d at 22 ("'[A]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.'").

(b)    Officer Schmitt's Constitutional Violation is<br>Obvious.

Even if the Court assumed that the precedent cited above does not clearly establish that Officer Schmitt urinating on Seweid violates the Eighth Amendment, the Court can deny qualified immunity based on the "obviousness" of the alleged Constitutional violation.  See Taylor, 592 U.S. at 7.  In the Court's view, under Taylor and Hope, the Eighth Amendment applies with "obvious clarity" to a correctional officer who urinates on an inmate for no penological purpose—even in the absence of a controlling case exactly on point.  Taylor, 592 U.S. at 8–9 (quoting Hope, 536 U.S. at 741).  Put differently, the Court finds that "any reasonable officer should have realized that" the conduct alleged here—directly urinating on an inmate while also urinating all over his belongings—"offended the Constitution."  Id. at 9.

Seweid's testimony, which we must accept at this stage, is that there was no legitimate law enforcement or penological reason for Officer Schmitt to urinate in his cell or on him.  In that context, how could any correctional officer not know that unprovoked urination on an inmate is unlawful?  The Court need not be—and will not be—"oblivious to the obvious."  Ramirez, 2 F.4th at 523 (Willett, J., dissenting in denial of rehearing en banc).  The qualified immunity doctrine "does not require judicial blindness."  Id.  Against that backdrop, the Court is unwilling to accept that it would have been reasonable for Officer Schmitt to think the law allowed him to gratuitously urinate on Seweid on October 17, 2018.

31

*     *     *

In sum, on the facts presented by Seweid, the Court concludes Officer Schmitt is not entitled to qualified immunity on Seweid's excessive force claim.

       c)    *PLRA.*

Finally, the Court considers Defendants' argument that Seweid's excessive force claim against Officer Schmitt is precluded by the Prison Litigation Reform Act—even if the claim rises to the level of an Eighth Amendment violation and even if Officer Schmitt is not entitled to qualified immunity.  (See Defs.' Br. 9–12.)  This is incorrect.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), provides, in relevant part, that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).  The PLRA's limitation on recovery "is generally interpreted to preclude a prisoner complaining of mental and emotional injury during imprisonment, without a showing of physical injury, from receiving an award of compensatory damages."[25]  Walker v. Schult, 45 F.4th 598, 612 (2d Cir. 2022).  "A prisoner's claim seeking damages for mental or emotional injury resulting from prison conditions, without a showing of physical injury, does not comply with § 1997e(e) and is thus subject to dismissal for failure to state a claim."  Id. (cleaned up) (citing Jones v. Bock, 549 U.S. 199, 222 (2007); Davis v. District of Columbia, 158 F.3d 1342, 1348–49 (D.C. Cir. 1998) (affirming a sua sponte dismissal for failure to state a claim where complaint for mental or emotional injury did not allege physical injury as

---

[25]    Because Seweid was incarcerated in the Cayuga Correctional Facility at the time he commenced this action, (see Defs.' 56.1 ¶¶ 6–12), this provision continues to apply.  Cf. Cano v. City of N.Y., 44 F. Supp. 3d 324, 331 (E.D.N.Y. 2014) (explaining that "§ 1997e(e) does not bar Plaintiffs, who were not incarcerated at the time they filed this action, from seeking any category of damages"); In re Nassau Cnty. Strip Search Cases, 2010 WL 3781563, at *5 (E.D.N.Y. Sept. 22, 2010) ("PLRA's recovery limitation . . . does not apply to plaintiffs not incarcerated at the time the action is brought").

required by § 1997e(e)); Calhoun v. DeTella, 319 F.3d 936, 940 (7th Cir. 2003) ("physical injury is . . . a predicate for an award of damages for mental or emotional injury"))).  "[T]here is no statutory definition of 'physical injury' as used in section 1997e(e)." Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999).  But the physical injury required under § 1997e(e) must be more than "de minimis." Id. (citing Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997)).

Here, Defendants argue the Court can and should dismiss Seweid's excessive force claim entirely because his claimed injuries do not satisfy § 1997e(e)'s physical injury requirement.  (See Defs.' Br. 9.)  Even if the Court agreed Seweid's that injuries failed to satisfy § 1997e(e)—a matter it need not decide—that conclusion would not compel dismissal of Seweid's claim full stop.  "Section 1997e(e) does not limit the availability of nominal damages . . . or of punitive damages." Thompson v. Carter, 284 F.3d 411, 418 (2d Cir. 2002); see also Walker, 45 F.4th at 612–13 (similar).  For that reason, courts in this Circuit routinely allow pursuit of nominal and punitive damages after dismissing related prayers for compensatory damages to remedy mental and emotional injuries.  See, e.g., Genao v. City of N.Y., 2021 WL 2111817, at *4 (S.D.N.Y. May 25, 2021); see also Holland v. City of N.Y., 197 F. Supp. 529, 537 (S.D.N.Y. 2016); Ford v. Aramark, 2020 WL 377882, at *15 (S.D.N.Y. Jan. 23, 2020); Walker v. City of N.Y., 367 F. Supp. 3d 39, 65 (S.D.N.Y. 2019); Allen v. Keanen, 2019 WL 1486679, at *4 (W.D.N.Y. Apr. 4, 2019).  For relief here, Seweid requests punitive damages, a declaratory judgment, and injunctive relief.  (See Compl. ¶ 106, ECF No. 1.)  Accordingly, even assuming Seweid's rash is not a cognizable "physical injury" under § 1997e(e), it would be inappropriate to dismiss his claim in its entirety on PLRA grounds.

**2.      Defendants are Not Entitled to Summary Judgment on Seweid's Failure to Intervene Claim.**

The Court now proceeds to consider Seweid's claim that Officers Destefano and Cruz failed to intervene in Officer Schmitt's constitutional violation.[26]  (See Compl. ¶¶ 55–60, ECF No. 1.)  In response, Defendants again marshal three arguments to support their summary judgment motion.  First, Defendants argue that Seweid does not have a viable failure to intervene claim on the merits.  (See Defs.' Br 12–14.)  Second, Defendants argue that—even if Seweid had a valid failure to intervene claim—the PLRA precludes his claim from going forward.[27]  (See Defs.' Br 9–12.)  Third, Defendants argue that Officers Destefano and Cruz are entitled to qualified immunity.  (See Defs.' Br 15–17.)

a)      *Applicable Law.*

Absent direct participation in an act of excessive force, defendants may still be held liable for constitutional violations under a failure to intervene theory.  See Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001).  For example, "[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."  Hayes v. N.Y.C. Dept. of Corrs., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  "[L]aw enforcement officials"—including prison officials—"have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  Terebesi, 764 F.3d at 243 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).  "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be."  Curley, 268 F.3d at 72.  That

---

[26]      Seweid's Complaint alleges a failure to intervene claim against Officers Schmitt, Destefano, and Cruz.  (See Compl. ¶ 59, ECF No. 1.)  But as mentioned, at a pretrial conference on October 11, 2023, the parties agreed to limit Seweid's failure to intervene claim to against Officers Destefano and Cruz only.  (See Ex. F at 3–4, ECF No. 55-9.)

[27]      The Court's PLRA discussion supra vitiates the need to consider the same issue on Seweid's failure to intervene claim.  The Court therefore does not address it.

34

said, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Anderson, 17 F.3d at 557.  "[W]hether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations."  Figueroa v. Mazza, 825 F.3d 89, 107 (2d Cir. 2016).  This question—"[w]hether the officer had a 'realistic opportunity' to intervene"—is "normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'"  Terebesi, 764 F.3d at 244 (quoting Anderson, 17 F.3d at 557).

But a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim."  Matthews v. City of N.Y., 889 F. Supp. 2d 418, 443–444 (E.D.N.Y. 2012).  Accordingly, "there can be no failure to intervene claim without a primary constitutional violation." Forney v. Forney, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015); see also Posner v. City of N.Y., 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014) (Furman, J.); Buari v. City of N.Y., 530 F. Supp. 3d 356, 392 (S.D.N.Y. 2021).  That is so because "[l]iability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." Figueroa, 825 F.3d at 106 (quoting O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d Cir. 1988)).

With respect to qualified immunity, Officers Destefano and Cruz are entitled to the defense "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "To overcome the defense of qualified immunity for failure to intercede where others have engaged in excessive force, a plaintiff must show that the failure to intercede permitted fellow officers to violate an individual's clearly established rights of which a reasonable officer would have known, and 'the failure to intercede must be under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights.'"  Speights v. City of

N.Y., 2001 WL 797982, at *6 (E.D.N.Y. June 18, 2001) (quoting Ricciuti v. New York City Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)).

       b)    *Analysis.*

For two reasons, the Court denies Defendants' motion for summary judgment on Seweid's failure to intervene claim against Officers Cruz and Destefano.

First, there is a genuine dispute of fact about whether Officers Destefano and Cruz had a realistic opportunity to intervene to prevent Officer Schmitt's alleged urination.  Defendants contend Seweid's narrative suggests no evidence that "Officers Cruz and Destefano—while outside of the cell—were in any position to prevent Officer Schmitt from urinating inside [the] cell." (Defs.' Br. 13–14.)  Although Seweid concedes the two officers never entered the cell, he alleges they stood "outside the cell looking in." (Seweid Dep. Tr. at 46.)  In reply, Defendants contend Seweid's statements about the officers' opportunity to intervene are "conclusory." (Defs.' Rep. Br. 13.)

In the Court's view—taking the facts again in the light most favorable to Seweid—a reasonable jury could credit Seweid's testimony and conclude that Officers Cuz and Destefano had a realistic opportunity to intervene in Officer Schmitt's conduct, even while they stood outside the cell.  Although questions about the duration of Officer Schmitt's conduct persist, this factual dispute precludes the Court from granting summary judgment to Defendants on the merits of Seweid's failure to intervene claim.  See Terebesi, 764 F.3d at 244 ("Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'") (quoting Anderson, 17 F.3d at 557)).

Second, qualified immunity does not alter this conclusion.  Because the Court concluded it is clearly established that Officer Schmitt's alleged use of force was unlawful under the Eighth

Amendment, it necessarily follows that Officers Cruz and Destefano had a clearly established obligation to intervene to stop such conduct. See Ricciuti, 124 F.3d at 129 (observing that an officer "cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known" (quotations omitted)).

At the time of the alleged conduct, the relevant constitutional law was clearly established. See Anderson, 17 F.3d at 557 ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."); see also Hudson, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... whether or not significant injury is evident." (internal citation omitted)); Hogan, 738 F.3d at 516 (correctional officers spraying an inmate with a mixture of feces, vinegar, and machine oil was "undoubtedly repugnant to the conscience of mankind and therefore violates the Eighth Amendment" (internal quotations omitted)). On the facts interpreted in the light most favorable to Seweid, a reasonable juror could find that (i) Officer Cruz and Officer Destefano's failure to intervene while Officer Schmitt urinated on Seweid—for a reason with no penological purpose—permitted Officer Schmitt to violate Seweid's clearly established Eighth Amendment rights; and (ii) that the failure to intervene was objectively unreasonable.

Therefore, Officers Cruz and Destefano are not entitled to qualified immunity.

**3.      There is No Basis for Corporal Sewer and the Sherriff's Department to Remain Defendants.**

The Court now turns to Defendants' argument that Corporal Sewer and Nassau County Sheriff's Department should be dismissed as defendants from the case. (See Defs.' Br. 14, 18.) The Court agrees on both scores.

37

With respect to Corporal Sewer, Defendants argue dismissal is warranted because no legal claim remains against him.  (See id. at 14.)  And even if one did, Defendants further argue Seweid conceded to Sewer's dismissal in his opposition by failing to address Defendants' arguments.  (See Defs.' Rep. Br. 1.)  Although Seweid has not formally discontinued the claim against Corporal Sewer, the Court agrees no legal claim remains against him.  The only claim Seweid asserted against Corporal Sewer was a due process claim (Count VII), which the parties agreed to dismiss at two different pretrial conferences on September 27, 2023 and October 11, 2023.  (See Ex. E at 4–6, ECF No. 55-8; see also Ex. F at 3–4, ECF No. 55-9.)  Even if Count VII remained before the Court, Seweid effectively conceded to Corporal Sewer's dismissal by failing to address Defendants' arguments in his opposition brief.[28]  Addressing the merits only for completeness, Seweid admitted Corporal Sewer conducted a cell check the evening of October 17, 2018, which conclusively rebuts the "due process" claim against him and renders it a nullity.  (Compare Compl. ¶¶ 11, 24, 27, 71, ECF No. 1, with Seweid 56.1 at 8 ¶¶ 31–33.)

With respect to the Nassau County Sherriff's Department, Defendants argue it should be dismissed from the case because it is a non-jural entity that cannot sue or be sued.  (See Defs.' Br. 18.)  The Court agrees.  It is well settled in this district that, "under New York law, departments that are merely administrative arms of a municipality"—such as Nassau County Sherriff's Department—"do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued."  Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002)

---

[28]     Courts may "infer from a party's partial opposition [to summary judgment] that relevant claims or defenses that are not defended have been abandoned."  Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014).  Accordingly, the Court concludes Seweid abandoned his claim against Corporal Sewer.  See id. at 196–98 (affirming dismissal of claims as abandoned during summary judgment briefing); see also Malik v. City of N.Y., 841 F. App'x 281, 284 (2d Cir. 2021) (similar); Curry Management Corp. v. JPMorgan Chase Bank, N.A., 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief"); Bradley v. Markel Service, Inc., 2023 WL 6199867, at *7 (S.D.N.Y. Sept. 22, 2023) (same, collecting cases); Santucci v. Levine, 2022 WL 121281, at *1 (2d Cir. Jan. 13, 2022) ("[B]ecause the [Plaintiffs] failed to respond to Defendants' argument . . . the [Plaintiffs] effectively conceded th[e] argument in the court below.)."

(dismissing claim against Lynbrook Police Department); see also Melendez v. Nassau Cnty., 2010 WL 3748743, at *5 (E.D.N.Y. Sept. 17, 2010) (dismissing claim against Nassau County Sherriff's Department because it is an "administrative arm[] of Nassau County" and therefore not a "suable entit[y]"); Matteo v. Cnty. of Nassau, 2023 WL 5310587, at *14 (E.D.N.Y. Aug. 1, 2023) (same), report and recommendation adopted, 2023 WL 5310874 (E.D.N.Y. Aug. 17, 2023); Little v. Cnty. of Nassau, 2023 WL 8828825, at *4 (E.D.N.Y. Dec. 21, 2023) (same); Gazzola v. Cnty. of Nassau, 2022 WL 2274710, at *15 (E.D.N.Y. June 23, 2022) (same); Gleeson v. Cnty. of Nassau, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (same).

Accordingly, the Court dismisses Corporal Sewer and Nassau County Sherriff's Department as defendants from the case.

### 4. Seweid's Bifurcated Municipal Liability Claims Cannot Be Dismissed.

Finally, the Court considers Defendants' argument—raised in passing—that the bifurcated Monell claims should be dismissed along with the underlying claims. (See Defs.' Br. 17.) Defendants' only argument for dismissing the bifurcated Monell claims is that there can be no municipal liability where its officers do not commit an underlying Eighth Amendment violation. (See id.) But as discussed above, the Court concluded that genuine disputes of fact persist as to whether Officers Schmitt, Cruz, and Destefano committed Eighth Amendment violations. Accordingly, the Court cannot dismiss the bifurcated Monell claims in this instant motion for summary judgment.

### III. CONCLUSION

For the reasons stated above, the Court denies summary judgment to Defendants, dismisses Corporal Sewer and the Nassau County Sheriff's Department as defendants from the case, and declines to dismiss the bifurcated Monell claims at this stage.

A pretrial conference is scheduled for March 5, 2024, at 10:00 AM before Judge Azrack in Courtroom 920 of the Long Island Courthouse.

The Clerk of Court is respectfully directed to amend the caption of the case to read "OFFICER BRYAN SCHMITT."

**SO ORDERED.**

Dated:   February 20, 2024
        Central Islip, New York

                                       /s/ JMA
                             JOAN M. AZRACK
                             UNITED STATES DISTRICT JUDGE